UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RAYMOND THOMAS,

                    Plaintiff,                        CIVIL ACTION NO. 04-CV-73159-DT

        vs.

                                                      DISTRICT JUDGE GEORGE CARAM STEEH

COMMISSIONER OF
SOCIAL SECURITY,                                      MAGISTRATE JUDGE MONA K. MAJZOUB

                    Defendant.
_____/

## REPORT AND RECOMMENDATION

This Court recommends that Defendant's Motion for Summary Judgment be **GRANTED** and Plaintiff's Motion for Summary Judgment be **DENIED**. The decision of the Commissioner is supported by substantial evidence on the record.

## PROCEDURAL HISTORY

This is an action for judicial review of the final decision by the Commissioner of Social Security that the Plaintiff was not entitled to Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423. The issue for review is whether the Commissioner's decision is supported by substantial evidence on the record.

Plaintiff Raymond Thomas filed an application for Disability Insurance Benefits (DIB) with Defendant on June 27, 2001. (Tr. 44-46). Plaintiff alleged he had been disabled since May 2, 1986. *Id.* Plaintiff meets the special insured requirements for disability through December 30, 1995. (Tr. 13). Defendant initially denied Plaintiff's application. (Tr. 31). Plaintiff appealed and received a hearing before Administrative Law Judge (ALJ) Earl A. Witten on November 21, 2002. (Tr. 620). March 21, 2003, the ALJ denied Plaintiff's appeal in a written decision. (Tr. 10-25). Plaintiff was

born on June 26, 1941, and was 61 years old at the time of the ALJ's decision.  The ALJ concluded that Plaintiff had a severe medical impairment, but retained the ability to perform some of his past relevant work.  (Tr. 25).  Plaintiff appealed the ALJ's decision to the Appeals Council, which denied review on June 22, 2004, making the ALJ's decision the final decision of the Commissioner.  (Tr. 4-5); 20 C.F.R. § 404.981.

## **MEDICAL HISTORY**

On May 6, 1986, Michael Hepner, M.D., reviewed Plaintiff's medical history of bronchial asthma.  (Tr. 438).   To control his condition Plaintiff was given an albuterol inhaler, a home nebulizer, prescriptions and directions to use alupent and atropine with the nebulizer, and an epipen to administer in an emergency for anaphylactic reactions.  *Id.*   Plaintiff was hospitalized on the evening of May 7, 1986, for acute exacerbation of his bronchial asthma.  (Tr. 437).  He was diagnosed with an acute bronchospasm.  (Tr. 437).  Plaintiff's chest x-ray showed bilateral pleural thickening, and an EKG showed normal sinus rhythm with a non-specific t-wave abnormality.  (Tr. 357).

On May 19, 1986, Dr. Hepner reviewed Plaintiff's condition and opined that because Plaintiff had a tendency to panic when he felt shortness of breath, his difficulty controlling his asthma had "an important emotional component" (Tr. 436).  Dr. Hepner placed Plaintiff on Xanax to help control Plaintiff's anxiety.  *Id.*  On June 17, 1986, Plaintiff visited Dr. Hepner again and complained of marked breathlessness and wheezing.  (Tr. 433).  On physical examination, Plaintiff showed mild wheezing with good breath sounds, and relatively good peak airflow.  *Id.*  At the time, Plaintiff was attempting to sell a hog farm he had been running.  (Tr. 433).  Dr. Hepner noted that Plaintiff's condition might improve when he had less exposure to the hog farm environment.  *Id.*

On July 8, 1986, Plaintiff remarked that his symptoms had significantly improved. (Tr. 431). Plaintiff was advised that he would be off work for at least another two to three months, and that he should not be exposed to "paint fumes, etc." when he returned. (Tr. 431-32). On September 9, 1986, Plaintiff told Dr. Hepner that he had generally been "fairly comfortable," but continued to experience wheezing and dyspnea. (Tr. 431). Plaintiff exhibited good breath sounds at the time, but Plaintiff demonstrated only 61% of his expected forced expiratory volume during spirometry testing. *Id.* On December 8, 1986, Dr. Hepner indicated that Plaintiff's wheezing and dyspnea had improved somewhat, and that Plaintiff had gained some relief by moving away from the hog farm and acquiring a new bed. (Tr. 428-429).

On January 8, 1987, Plaintiff was evaluated by a pulmonologist, Joseph Ward, M.D. (Tr. 427). Dr. Ward noted that Plaintiff had begun receiving substantial doses of corticosteroids to control his bronchial asthma beginning in May, 1986. *Id.* Plaintiff and his doctors attempted to reduce Plaintiff's steroid dosage in late 1986, but had to increase it again when Plaintiff's symptoms began to recur. *Id.* Dr. Ward noted that Plaintiff's weight had fluctuated between 292 and 220 pounds, and had recently increased to 252 pounds. *Id.* He noted that Plaintiff was obese at 252 pounds and that he showed substantial cushingoid features. (Tr. 427).

Plaintiff had a thoracic spine x-ray taken on March 20, 1987. (Tr. 425). A comparison of this film with an x-ray of the same area taken on February 2, 1985 showed a slight anterior wedge deformity of the T12 veterbra. (Id). On March 27, 1987, x-rays were taken of Plaintiff's lungs at the Henry Ford hospital. (Tr. 425). Plaintiff's lungs appeared normal except for scattered linear parenchymal densities along the lung bases. *Id.*

On March 30, 1987 Plaintiff was evaluated for cortico-steroid induced osteopenia.  (Tr 423).

While Plaintiff had typical cushingoid obese features, he showed no specific signs of osteoporosis.

*Id.*  Plaintiff was advised to continue taking calcium and minimize his steroid intake to the extent

possible.  *Id.*

Plaintiff was hospitalized from April 5, 1987 to April 11, 1987 for treatment of sigmoid

diverticulitis, severe steroid-dependent asthma, and diabetes mellitus secondary to cortico-steroid use.

(Tr. 361-62).  Plaintiff was hospitalized again from April 20, 1987 to May 2, 1987 for hypokalemia,

dehydration, and hyponutremia.  (Tr. 364-371).  An April 20 air contrast colon examination showed

sigmoid divericulosis but no diverticulitis or other abnormalities.  (Tr. 370).  A chest x-ray taken the

same day showed spondylosis of the thoracic spine, but no evidence of active pulmonary disease.  (Tr.

369).  A May 8, 1987 chest x-ray also failed to show any evidence of active pulmonary disease.  *Id.*

On June 9, 1987 Dr. Hepner opined that Plaintiff had been disabled by his asthma since May

2, 1986 and would be disabled for another two to three months.  (Tr. 420).  On September 6, 1987,

Plaintiff was treated for acute nephrolithiasis.  (Tr. 374).  Two weeks later, Plaintiff was hospitalized

for five days for treatment of acute urinary retention secondary to blood clots, urethritis, cystitis,

diverticulosis, umbilical hernia, and severe asthma.  (Tr. 375-76).  On September 25, 1987, Norman

Krieger M.D. examined Plaintiff and recommended conservative care for his umbilical hernia.  (Tr.

588).

On January 19, 1988 a pulmonary function test showed minimal obstruction of Plaintiff's

airway, consistent with peripheral airway dysfunction.  (Tr. 417).  Joseph C. Ward, M.D. also

performed a cardiovascular stress test on Plaintiff on January 19, 1988.  (Tr. 413).  Dr. Ward

concluded that Plaintiff's limited maximum exercise capacity resulted from cardiovascular unfitness, rather than from disease of the heart or lungs. *Id.*

On March 29, 1988 Dr. Hepner noted that Plaintiff had returned to work. (Tr. 410). Plaintiff resumed his medical leave of absence on April 28, 1988. (Tr. 409). On May 3, 1988 Plaintiff complained to Dr. Hepner that his wheezing and shortness of breath were growing worse while working. *Id.* On November 23, 1988, Joseph M. Kopmeyer, M.D. examined Plaintiff. (Tr. 387). While Plaintiff's lungs appeared essentially normal, pulmonary testing suggested an obstructive ventilatory defect that did not improve dramatically in response to bronchodilators. (Tr. 387-402). Dr. Kopmeyer opined that Plaintiff's bronchial asthma had a definite allergic component. *Id.*

On April 6, 1993, Juan Rodriguez, M.D. noted that Plaintiff's asthma had been stable while on his prescribed medications. (Tr. 459). Plaintiff, however, complained that he had difficulty doing any more than his normal functional activities. *Id.* Dr. Rodriguez examined Plaintiff again on March 22, 1994, at which time he characterized his symptoms as well controlled. (Tr. 457). During a July 26, 1994 follow-up visit with Dr. Rodriguez, Plaintiff complained that he had been having a bad summer, and Dr. Rodriguez noted that Plaintiff's peak airflow results had been relatively poor in the preceding months. (Tr. 455). Dr. Rodriguez advised that Plaintiff take Prednisone for a few days, and consider regular atrovent nebulization. *Id.*

On September 30, 1994 Plaintiff was diagnosed with degenerative arthrosis of the right knee. (Tr. 454). Chest x-rays of Plaintiff taken on February 23, 1995 showed no change from earlier x-rays. (Tr. 451). On March 16, 1996 Michael J. Paletta, M.D. evaluated Plaintiff. (Tr. 447). Dr. Paletta noted that "until he recently [Plaintiff] had been capable of great physical work and was running a hog farm and a landscape business without much impairment. *Id.* Dr. Paletta noted Plaintiff had

-5-

worsening bronchial asthma, chronic stasis edema, benign prostatic hyperplasia, diffuse idiopathic skeletal hyperostosis, and was morbidly obese.  *Id.*

An April 11, 1995 echocardiogram of Plaintiff showed that he had a hypertrophic left ventricle, and abnormally dilated right ventricle and right atrium, a sclerotic aortic valve, and trace mitral and tricuspid insufficiency.  (Tr. 444).  On March 6, 1996, Dr. Rodriguez evaluated Plaintiff's asthma and concluded that it was well controlled.  (Tr. 442).

On March 22, 2001, John Buckley, M.D. opined that Plaintiff's bronchial asthma was consistent with possible exposure to toxic chemicals in 1986, and was possibly secondary to reactive airways dysfunction syndrome.  (TR. 509).  On April 25, 2001, Amir Quefatieh evaluated Plaintiff's sleep apnea.  (Tr. 503).  He noted that while Plaintiff had previously obtained good relief from a continuous positive airway pressure (CPAP) machine, he had recently been having substantial difficulty sleeping.  (Tr. 505).  Dr. Quefatieh examined Plaintiff and noted that he had gained eighty pounds in the preceding two years.  *Id.*  Dr. Quefatieh recommended increasing the pressure in Plaintiff's CPAP machine.  *Id.*

X-rays of Plaintiff's right knee, right shoulder, and lumbar spine taken on April 27, 2001 showed advanced degenerative disease of Plaintiff's lower lumbar spine and right knee.  (Tr. 501).

## HEARING TESTIMONY

At a November 21, 2002 administrative hearing, ALJ Earl A. Witten took testimony from the Plaintiff and a vocational expert, Paul Delmar, Ph.D.  (Tr. 620-650).  Plaintiff was born on June 26, 1941 and completed his G.E.D. some time in the nineteen sixties.  (Tr. 624).  Plaintiff testified that prior to 1995 he typically weighed somewhere around two hundred and twenty pounds.  (Tr. 625).

-6-

Plaintiff was weighed at 341 pounds in 1995, and he attributed much of the weight gain to corticosteroid use. (Tr. 627). Plaintiff testified that in 1986 he was unable to walk or stand for any prolonged period due to his asthma and right leg pain. (Tr. 629-630). Plaintiff testified that he was not able to sleep in a bed and slept poorly in a chair from 1986 until he began using a CPAP machine in 1998. (Tr. 632-633).

The vocational expert was asked to provide testimony about the availability of work for a hypothetical person of Plaintiff's age, work history and educational history who was subject to certain physical limitations. (Tr. 647). Specifically, he was asked to assume the hypothetical person could performing sedentary work in a controlled environment relatively free of dust, smoke, and fumes with no repetitive bending, twisting, or turning, no crawling, squatting, kneeling, or climbing, no reaching overhead, and no exposure to unprotected heights, unprotected machinery, or extreme temperatures. (Tr. 648). The vocational expert testified that such a person would be able to perform Plaintiff's past relevant work as an insurance salesman. *Id.*

## STANDARD OF REVIEW

Title 42 U.S.C. § 405(g) gives this Court jurisdiction to review the Commissioner's decisions. Judicial review of those decisions is limited to determining whether her findings are supported by substantial evidence and whether she employed the proper legal standards. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson,* 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)). It is not the function of this court

-7-

to  try cases *de novo*, resolve conflicts in the evidence, or decide questions of credibility.  *See*

*Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

In determining whether substantial evidence supports the Commissioner's decision, the Court

must examine the administrative record as a whole.  *Kirk v. Sec'y of Health and Human Servs.*, 667

F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).  If the Commissioner's decision is

supported by substantial evidence, it must be affirmed, even where substantial evidence also supports

the opposite conclusion and the reviewing court would decide the matter differently.  *Her v. Comm'r*,

203 F.3d 388, 389-90 (6th Cir. 1999).

## DISCUSSION AND ANALYSIS

The Plaintiff's Social Security disability determination was made in accordance with a five

step sequential analysis.  In the first four steps, Plaintiff had to show that, prior to December 30, 1995:

    (1)       he was not presently engaged in substantial gainful employment; and

    (2)       he suffered from a severe impairment; and

    (3)       the impairment met or was medically equal to a "listed impairment;" or

    (4)       he did not have the residual functional capacity (RFC) to perform his relevant past work.

*See* 20 C.F.R. § 404.1520(a)-(e); 20 C.F.R.. § 416.920(a)-(e). If Plaintiff's impairments prevented him

from doing his past work, the Commissioner would, at step five, consider his RFC, age, education and

past work experience to determine if he could perform other work.  If he cannot, he would be deemed

disabled.  20 C.F.R. § 404.1520(f).  The Commissioner has the burden of proof only on "the fifth step,

proving that there is work available in the economy that the claimant can perform."  *Her*, 203 F.3d

at 391.  To meet this burden, the Commissioner must make a finding "supported by substantial

evidence that [the claimant] has the vocational qualifications to perform specific jobs."  *Varley v.*

-8-

*Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).  This "substantial evidence" may be in the form of vocational expert testimony in response to a hypothetical question, "but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments.'" *Id*. (citations omitted).

The ALJ concluded that Plaintiff suffered from a severe impairment that was not medically equal to a listed severe impairment but that Plaintiff could perform some of his past relevant work.

Plaintiff argues that the ALJ was bound to conclude that Plaintiff was disabled because his asthma and obesity met or medically equaled a "listed impairment."  As Defendant points out, the listing for asthma, 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 3.03(b) requires a diagnosis with:

> attacks as defined in 3.00C in spite of prescribed treatment and requiring physician intervention occurring at least once every two months or at least six times a year.  Each inpatient hospitalization for longer than 24 hours for control of asthma counts as two attacks, and an evaluation period of at least 12 consecutive months must be used to determine the frequency of attacks.

The ALJ correctly concluded that the medical record does not support such a finding that Plaintiff meets the listing in § 3.03(b).  While Plaintiff was hospitalized in 1986 for a very severe asthma attack, the medical records do not show that Plaintiff consulted with a physician six times a year thereafter for treatment of his asthma.  Regardless of whether a regular office visit to monitor a patient's asthmatic condition can count as a "physician intervention" under § 3.03(B), Plaintiff's medical records simply fail to meet the requirements of the listed impairment.

Plaintiff notes that under Social Security Ruling 00-3p, obesity alone can be medically equivalent to a listed impairment.  In addition, SSR 00-3p directs a finding that a claimant medically equals a listed impairment when obesity combined with another medical problem meets a listed impairment.  However, SSR 00-3p only directs a finding that a claimant "medically equals" a listed

impairment when a claimant's obesity, alone or in combination with another condition, produces the same symptoms as the listed impairment.  As discussed above, Plaintiff's symptoms do not meet the criteria for the § 3.03(B) listing for asthma, regardless of what effect obesity has on that condition. Plaintiff has failed to identify any other listed impairment that he considers his obesity to medically equal.

Plaintiff raises two challenges to the ALJ's findings concerning Plaintiff's Residual Functional Capacity (RFC).  First, he argues that the ALJ failed to follow the treating physician rule when he declined to credit the statement of Dr. Hepner that Plaintiff was "totally disabled" in 1987.  The medical opinions and diagnoses of treating physicians are entitled to great weight. *King v. Heckler*, 708 F.2d 1048 (6th Cir. 1983).  Indeed "if the opinion is uncontradicted, complete deference . . . must be given to such opinions and diagnoses."  *Id.*  However, the ALJ is not bound by the conclusory statements of treating physicians where they are unsupported by detailed objective criteria.  *Cohen v. Sec'y of Health and Human Servs.*, 964 F.2d 524, 528 (6th Cir. 1992) (citing *Duncan v. Sec'y of Health and Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986).

Dr. Hepner's statement that Plaintiff is "totally disabled" is conclusory and not supported by detailed objective criteria.  Repeated examinations of Plaintiff show that while Plaintiff complained of breathlessness and severe wheezing, physical examinations generally showed only mild breath noises, and relatively good airflow.  These objective records contradict Dr. Hepner's general assertion that Plaintiff is "disabled."  In light of the state of the record, the ALJ was free to give controlling weight to the results of specific objective medical tests and examinations, rather than Dr. Hepner's vague assertion.

-10-

Second, Plaintiff's brief states that Plaintiff "would/could pose additional arguments relative [sic] to the ALJ's assessment of Mr. Thomas' credibility and residual functional capacity. However, the constraints regarding the length of briefing these issues and the number of pages allotted requires [P]laintiff to address, instead, the most glaring defect in the hearing decision." Even assuming *arguendo* that this aside is sufficient to present an issue to the Court, the ALJ's credibility determination was supported by substantial evidence. The ALJ explicitly considered Plaintiff's credibility in light of the objective medical evidence and Plaintiff's own prior statements regarding his daily activities and functional capacity. Given that there were substantial conflicts between Plaintiff's hearing testimony and the other evidence on the record, it was not error for the ALJ to give less than complete deference to Plaintiff's testimony.

Plaintiff argues that the ALJ's step four finding that Plaintiff could perform his past work as an insurance salesman is error. In particular, Plaintiff argues that while the ALJ determined that Plaintiff only had the residual functional capacity (RFC) for "sedentary" work, work as an insurance salesman is "light" work, and Plaintiff was thus incapable of performing it. "Sedentary work" generally involves no more than two hours of an eight hour day spent standing or walking. *See* S.S.R. 83-13; S.S.R. 85-15.

Plaintiff is correct that the Dictionary of Occupational Titles describes "insurance sales" as light work. There is no evidence in the record suggesting that the job of insurance salesman, as it is generally performed in the economy, is "light" work. However, Plaintiff fails at step four if he cannot show that he is incapable of performing *his* past relevant work, regardless of whether that work exists in significant numbers in the national economy. *Barnhart v. Thomas* 540 U.S. 20, 29 (2003). Therefore, Plaintiff fails at step four if he can still perform his past relevant work as an insurance

-11-

salesman, regardless of whether insurance salesmen generally must do things Plaintiff cannot. Although Plaintiff described his work as an insurance salesman from 1974 to 1977 as requiring two hours of walking and one hour of standing in an eight hour day, (Tr. 315), he also described a more recent insurance sales job, from 1980 to 1983, as involving only one hour per day of sitting and one hour per day of standing. Substantial evidence on the record supports the ALJ's conclusion that, prior to December 30, 1995 Plaintiff retained the RFC to perform Plaintiff's past relevant work as an insurance salesman as Plaintiff performed it between 1980 and 1983. The record therefore supports the ALJ's conclusion that Plaintiff was not disabled prior to his date last insured.

## RECOMMENDATION

Plaintiff's Motion for Summary Judgment should be **DENIED**, and Defendant's Motion for Summary Judgment should be **GRANTED**.

Either party to this action may object to and seek review of this Report and Recommendation, but must act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to Rule 72.1(d)(2) of the *Local Rules of the United States District Court for the Eastern District of Michigan*, a copy of any objection must be served upon this Magistrate Judge.

-12-

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: August 16, 2005                    s/ Mona K. Majzoub_____
                                          MONA K. MAJZOUB
                                          UNITED STATES MAGISTRATE JUDGE

**Proof of Service**

I hereby certify that a copy of this Report and Recommendation was served upon Counsel of Record on this date.

Dated: August 16, 2005                    s/ Lisa C. Bartlett_____
                                          Courtroom Deputy